IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

KRYSTENA MURRAY,

      Plaintiff,

      v.

COASTAL FERTILITY SPECIALISTS, LLC;
DR. JEFFREY GRAY; and DOES 1
THROUGH 5, inclusive,

      Defendants.

CIVIL ACTION NO.: 4:25-cv-85

**O R D E R**

Plaintiff Krystena Murray brought this action to recover damages for her physical and emotional injuries following a heartbreaking mistake during an in vitro fertilization ("IVF") procedure.  (See doc. 1.)  Defendants are Coastal Fertility Specialists, LLC ("Coastal Fertility"), a South Carolina LLC; Dr. Jeffrey Gray, PhD, the director of the embryology laboratory at Coastal Fertility; and Does 1 through 5, five individuals who worked for Coastal Fertility whose names are not yet known to Plaintiff.  (Id. at pp. 10–11.)  Before the Court is Defendants' Motion for Judgment on the Pleadings.  (Doc. 36.)  Plaintiff filed a Response, (doc. 40), and Defendants filed a Reply, (doc. 48).  Plaintiff has also filed a Motion for Hearing on the Motion for Judgment on the Pleadings.[1]  (Doc. 49.)  For the reasons below, the Court **GRANTS in part** and **DENIES in part** Defendants' Motion for Judgment on the Pleadings.  (Doc. 36.)

---

[1]  The Court has considered the parties' fully briefed submissions on Defendants' Motion for Judgment on the Pleadings and finds that there is no need for a hearing.  Accordingly, the Court **DENIES** Plaintiff's Motion for Hearing.  (Doc. 49.)

**BACKGROUND**

**I.      Factual Background**

The facts as alleged in the Complaint are as follows.  Coastal Fertility operates fertility clinics throughout Georgia and South Carolina that provide various fertility-related services, including IVF retrieval cycles and transfer procedures.  (Doc. 1, p. 10.)  Plaintiff sought Coastal Fertility's services for help in becoming pregnant.  (Id. at p. 8.)  Plaintiff chose to contract with Coastal Fertility due in part to representations made on the Coastal Fertility website regarding the clinic's high standard of safety and quality, including that "there is no safer place for . . . embryos" than Coastal Fertility's laboratory.  (Id. at p. 13.)  Coastal Fertility's website also included a video which detailed the IVF process and made further assurances related to the quality of care provided.  (Id. at pp. 13–14.)

Plaintiff is a white woman and chose a sperm donor of the same race who physically resembles her.  (Id. at p. 15.)  Plaintiff intended for Defendants to retrieve Plaintiff's eggs and fertilize them with her chosen donor's sperm before implanting the resulting fertilized embryo into Plaintiff.  (Id.)  IVF is an expensive and arduous process involving months of appointments, tests, and drug therapy.  (Id. at pp. 15–16.)  As part of this process, Plaintiff was subjected to painful drug injections up to five times per day for two to three weeks.  (Id. at p. 16.)  The injections caused Plaintiff to experience stomach bloating and sharp mood swings.  (Id.)  Plaintiff then underwent egg-retrieval surgery, which led to substantial pain.  (Id.)  Eventually, Coastal Fertility transferred an embryo to Plaintiff.  (Id.)  However, this was not Plaintiff's embryo but an embryo belonging to another couple also using Coastal Fertility's services (the "Stranger Couple").  (Id. at p. 17.)  At no point in the process did Defendants warn Plaintiff of the risk that another patient's embryo might be implanted into her.  (Id. at p. 15.)

2

Plaintiff became pregnant following the embryo transfer and suffered common pregnancy side effects such as swelling, fatigue, and heartburn. (Id. at p. 17.) Plaintiff went to the hospital twice during her pregnancy due to concerns that she was going into labor prematurely. (Id.) Plaintiff endured these difficulties by reminding herself of her future child. (Id.) When Plaintiff delivered her baby, however, she immediately knew something was wrong. (Id. at p. 18.) Although Plaintiff is a fair-skinned white woman and had chosen a sperm donor with similar physical characteristics, she had delivered a dark-skinned Black baby. (Id.) Plaintiff immediately realized that the child was not related to her biologically, a realization she alleges was "terrifying and shocking." (Id.) While Plaintiff has no issues or concerns with the baby's race, the obvious mistake with the embryo transfer led to feelings of confusion and anxiety. (Id.)

Despite her confusion and fear, Plaintiff closely bonded with the baby. (Id. at p. 19.) Plaintiff breast-fed him, took him to doctor's appointments, and cuddled with him throughout the day. (Id.) However, Plaintiff hid her new baby from friends and family to avoid answering uncomfortable questions about whose baby she had delivered. (Id.) Plaintiff claims that she was frequently subjected to "awkward and inappropriate comments" in public regarding the baby. (Id. at p. 20.) Plaintiff nevertheless grew very close to the baby, describing him as "her best friend, her daily companion, and her source of strength." (Id.) Still, Plaintiff was haunted by persistent fear and anxiety that someone would come to take the baby away. (Id.)

Plaintiff was eventually informed that Coastal Fertility had transferred the Stranger Couple's embryo to her. (Id. at p. 21.) Three months after Plaintiff gave birth, Coastal Fertility informed the Stranger Couple what ocurred. (Id.) The Stranger Couple then sued Plaintiff to obtain custody of the child. (Id. at p. 22.) Plaintiff had to hire family-law counsel in multiple states, expending a considerable amount of time and money to retain custody of the child. (Id.)

3

Despite these efforts, Plaintiff eventually gave the baby to the Stranger Couple on the advice of her attorneys. (Id.) By this point, Plaintiff had spent "every moment" with the baby for five months and had developed a close bond with him. (Id.) Despite this strong motherly bond, Plaintiff will likely never see the baby again. (Id. at p. 23.) Plaintiff has subsequently suffered from sleeplessness, nausea, shortness of breath, and "numerous other manifestations of trauma." (Id.) Plaintiff has also decided to sell her house as she feels unable to live in the house where she bonded with the child. (Id.)

II.     **Procedural History**

On February 18, 2025, Plaintiff sued Defendants in Chatham County State Court. (See generally doc. 1.) Plaintiff raises the following claims against Defendants: negligence (Count I); gross negligence (Count II); bailment against Coastal Fertility (Count III); breach of fiduciary duty against Coastal Fertility (Count IV); fraudulent concealment (Count V); battery/lack of informed consent against Coastal Fertility (Count VI); violations of the Georgia Fair Business Practices Act, O.C.G.A. § 10-1-390, et seq., ("FBPA") (Count VII); and violations of the South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10, et seq., ("SCUTPA") (Count VIII). (Id. at pp. 25–46.) Plaintiff seeks recovery for her past and future medical expenses, pain and suffering, mental anguish, emotional distress, loss of the capacity for the enjoyment of life, and other general damages as a direct and proximate result of Defendants' alleged negligence. (Id. at p. 45.)

Defendants removed the case to this Court pursuant to 28 U.S.C. §§ 1332, 1441 & 1446. (Id. at pp. 1–4.) Defendants subsequently filed the at-issue Motion for Judgment on the Pleadings. (Doc. 36.) Defendants argue that Plaintiff has alleged injuries and damages on two distinct bases: "her carrying and delivering a child unrelated to her biologically" and her loss of custody of the child. (Id. at p. 11.) Defendants contend that the first basis constitutes a noncognizable claim for

wrongful birth while the second basis fails due to a lack of proximate cause. (Id. at pp. 5–11.) With respect to Plaintiff's battery claim in Count VI, Defendants argue in the alternative that Plaintiff consented to the medical procedure and that, at any rate, battery is an intentional tort and it is not alleged that Defendants intentionally implanted the wrong embryo. (Id. at pp. 12–13.) Defendants further argue that Plaintiff's SCUTPA claim in Count VIII fails as the alleged injuries occurred in Georgia and SCUTPA "has no extraterritorial application to injuries sustained in other states." (Id. at p. 11.)

## STANDARD OF REVIEW

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Federal Rule of Civil Procedure 12(c). "Judgment on the pleadings is proper when no issues of material fact exist, and the moving party is entitled to judgment as a matter of law based on the substance of the pleadings and any judicially noticed facts." Cunningham v. Dist. Att'y's Off. for Escambia Cnty., 592 F.3d 1237, 1255 (11th Cir. 2010) (internal quotation and citation omitted). Generally, to decide a motion for judgment on the pleadings, a court "may consider any of the pleadings, including the complaint, the answer, and any written instruments attached to them." 2 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE - CIVIL § 12.38 (2018). "The legal standards applicable to Federal Rule of Civil Procedure 12(c) motions for judgment on the pleadings and Rule 12(b)(6) motions to dismiss are the same." Marshall v. Safeco Ins. Co. of Ind., No.1:12-cv-113, 2013 WL 12155468, at *1 (S.D. Ga. Apr. 16, 2013). Therefore, the Court must "accept as true all material facts alleged in the non-moving party's pleading, and . . . view those facts in the light most favorable to the non-moving party." Perez v. Wells Fargo, N.A., 774 F.3d 1329, 1335 (11th Cir. 2014). A complaint should be dismissed pursuant to Federal Rule of Civil Procedure 12(c) only if "it is clear that the plaintiff

5

would not be entitled to relief under any set of facts that could be proved consistent with the allegations." Horsley v. Rivera, 292 F.3d 695, 700 (11th Cir. 2002); see also King v. Akima Glob. Servs., LLC, 775 F. App'x 617, 620 (11th Cir. 2019) (per curiam).

**DISCUSSION**

**I.    Whether Plaintiff's Claims Constitute a Noncognizable Wrongful Birth Action**

Defendants argue that this case "rises and falls" on whether Plaintiff's claims are for wrongful pregnancy or for wrongful birth. (Doc. 36, p. 5 (quoting Zelt v. Xytex Corp., 766 F. App'x 735, 739 (11th Cir. 2019).) In a wrongful pregnancy claim, the allegation is that the plaintiff would not have become pregnant had the medical provider properly performed a sterilization or abortion procedure. Zelt, 766 F. App'x at 739. The injury alleged is the unwanted pregnancy. Id. By contrast, a wrongful birth claim involves a plaintiff who wanted to become pregnant but alleges that the medical provider failed to provide information that, had it been provided, would have led the plaintiff to terminate the pregnancy. Id. The injury alleged is the birth of an impaired child. Id. Actions for wrongful pregnancy are recognized by Georgia law, but actions for wrongful birth are not. Id. at 738 (citing Atlanta Obstetrics & Gynecology Grp. v. Abelson, 398 S.E.2d 557, 560 (Ga. 1990)). This refusal to recognize wrongful birth actions is due to the principle that the law will not recognize the birth of a child as an injury. Id. at 739; see also Norman v. Xytex Corp., 848 S.E.2d 835, 840 (Ga. 2020). Another primary justification is the law's unwillingness to compare the value of the child's life to the child's nonexistence—a comparison which the law is "not equipped to make" and which would "belittle [the child's] worth as a person". Vance v. T.R.C., 494 S.E.2d 714, 719 (Ga. Ct. App. 1997) (internal citation and quotations omitted).

Because it is undisputed that Plaintiff wanted to become pregnant, Defendants argue that this is essentially an action for wrongful birth. (Doc. 36, pp. 8–10.) Defendants construe Plaintiff's

allegations as follows: the child was biologically unrelated to Plaintiff because Defendants implanted the wrong embryo and, had Defendants been "truthful" about the embryos, Plaintiff would not have used the embryo belonging to the Stranger Couple and thus would not have given birth to a biologically unrelated baby. (Id. at p. 9.) Defendants contend that Plaintiff is alleging the birth of a biologically unrelated child as an injury, an injury which Georgia law will not recognize. (Id. at pp. 9–10.)

Defendants analogize Plaintiff's claims to those brought in a series of cases against the Xytex Corporation, a sperm bank that made egregious misrepresentations about the identity and characteristics of a sperm donor. (Id. at pp 6–8.) These misrepresentations led to a slew of lawsuits against the sperm bank for its sale of defective sperm, all of which were dismissed as constituting noncognizable wrongful birth actions. (Id. at p. 7 (collecting cases).) The plaintiffs in these cases did not expressly seek to recover for wrongful birth but instead raised several different claims, which Defendants contend are similar to those brought by Plaintiff here. (Id. at pp. 7–8 (citing Norman, 848 S.E.2d at 838).) The Norman plaintiffs brought claims for "fraud, negligent misrepresentation, products liability and/or strict liability, products liability and/or negligence, breach of express warranty, breach of implied warranty, battery, negligence, unfair business practices, specific performance, false advertising, promissory estoppel, and unjust enrichment." Norman, 848 S.E.2d at 838. These claims were dismissed as "classic wrongful birth claims because the necessary and direct result" of not buying the sperm "is that the children born would not exist." Id. at at 842. Defendants argue that Plaintiff's claims should similarly be dismissed because "the necessary and direct result" of not implanting Plaintiff with the Stranger Couple's embryo "is that the child would not exist." (Doc. 36, p. 8 (quoting id. at 842).)

While Georgia law refuses to countenance wrongful birth claims, that does not mean that all claims arising from the birth of a child are barred. In Norman v. Xytex Corp., the Georgia Supreme Court stressed that, "[a]lthough Georgia law does not recognize life as an injury, there can be injuries that predate a child's birth and are not premised on the child's life as an injury. For almost 70 years, Georgia courts have recognized causes of action based on such injuries." 848 S.E.2d at 841 (collecting cases). "[I]n both pre- and post-conception cases, Georgia law has recognized that a cognizable claim may exist for pre-birth injuries . . . without deeming the child's existence an injury." Id. at 842. The Norman court further noted that the unavailability of wrongful birth claims does not preclude the recovery of damages so long as a plaintiff proves that the defendant caused an injury other than the life of a child. Id. Thus, while Plaintiff desired to become pregnant and seeks to recover for the outcome of her pregnancy, her claims are not automatically barred. Rather, the Court must examine the injuries alleged and Plaintiff's theory of damages. Here, Plaintiff brings claims for negligence, gross negligence, bailment, breach of fiduciary duties, fraudulent concealment, battery, and violations of Georgia and South Carolina consumer protection statutes. (Doc. 1, pp. 25–46.)

As an initial matter, it is not clear that proper conduct by Defendants would have "the necessary and direct result" of the Stranger Couple's child not being born. This is not the typical wrongful birth case where the allegations indicate that, but for the defendant's conduct, the plaintiff would have elected to abort the child. See, e.g., Spires v. Kim, 416 S.E.2d 780, 781 (Ga. Ct. App. 1992) ("An action for 'wrongful birth' . . . alleges basically that, but for the treatment or advice provided by the defendant, the parents would have aborted the fetus, thereby preventing the birth of the child." (quoting Abelson, 398 S.E.2d at 560)). Rather, Plaintiff alleges that, had the embryos been properly labeled, stored, and transferred, Plaintiff and the Stranger Couple each would have

8

received the correct embryos and given birth to their own biological children. The counterfactual is not that Plaintiff would have aborted her pregnancy or even that the child would not have been born, but that each embryo would have been transferred to and carried to term by its biological mother. In essence, Plaintiff is not complaining that the Stranger Couple's baby was born but rather than her child was not born.

Further, calculating Plaintiff's damages would not involve the troublesome considerations inherent in wrongful birth claims. As noted above, "[w]rongful birth claims are disfavored because they require the court to decide between the value of a life with disabilities and the value of no life at all." Doe 1 v. Xytex Corp., No. 1:16-CV-1453-TWT, 2017 WL 1036484, at *3 (N.D. Ga. Mar. 17, 2017); see also Vance, 494 S.E.2d at 719 ("[A] cause of action . . . seeking recovery for wrongful life demands a calculation of damages dependent upon a comparison between the Hobson's choice of life in an impaired state and nonexistence. This comparison the law is not equipped to make." (quoting Abelson, 398 S.E.2d at 560 n.4)). A wrongful birth plaintiff seeks to recover for the costs of a life with undesirable characteristics or challenges. See Abelson, 398 S.E.2d at 558 (plaintiffs sought recovery for the "costs of rearing, educating and otherwise providing for" a child with Down's Syndrome); Zelt, 766 F. App'x at 740 (plaintiffs sought recovery for "the impairments the children might have or develop as a result of inheriting" undesirable genes); Norman, 848 S.E.2d at 842 (holding that allowing recovery for the costs of birthing and raising child with alleged genetic impairments would "impermissibly transform . . . birth into a legal injury"). Plaintiff's claims here are of a different nature, focusing on her own harm rather than a child's impairment. (See doc. 1, p. 46.)

Defendants argue that Plaintiff's claims necessitate a comparison of "the value of a child biologically related to Plaintiff to one biologically related to another couple," (doc. 36, p. 10), but

this is unavailing. Plaintiff does not ask for damages related to raising an unrelated child or for the difference between the Stranger Couple's biological child and her own biological offspring. Instead, Plaintiff seeks recovery for the pain and suffering caused by not having a child of her own due to Defendant's misfeasance and being an unwitting surrogate and losing custody of a child with whom she had bonded and whom she had raised for five months. (See doc. 1, p. 46.) While many of Plaintiff's alleged injuries arise from the fact that the child she bore is biologically unrelated to her, it is not the lack of a biological relation in and of itself that constitutes the alleged injury but the painful ordeal she was subjected to as a result. (Id. at p. 23.) Plaintiff does not seek recovery for any characteristic of the child himself and there is thus no need for any improper comparisons involving the child. Instead, recovery can be afforded solely on Plaintiff's own pain.

Additionally, many Counts allege injuries clearly falling completely outside the ambit of the wrongful birth doctrine. For instance, with regard to the consumer protection claims in Counts VII and VIII, the Georgia Supreme Court has recognized that such claims can be brought in the childbirth and fertility context without running afoul of the wrongful birth doctrine. In Norman, the Court stated that a claim brought under Georgia's FBPA was not barred by the proscription on wrongful birth claims because such claims "do not depend on recognizing life as an injury." 848 S.E.2d at 843. There, the plaintiffs alleged that "Xytex made misrepresentations about the quality of their product (sperm) and services (screening process) to the public." Id. The Court stated that it could not say "at this procedural posture that the Normans suffered no injury" because, "[a]t a minimum, [they] may have paid more for [the sperm] than it was really worth." Id. Counts VII and VIII make similar allegations and similarly do not require this Court to treat life as an injury. (Doc. 1, pp. 37–46.) As in Norman, the Court here cannot say at present that Plaintiff has failed to allege an injury related to the alleged misrepresentations as the evidence eventually may show

10

that she overpaid for the medical treatment she received or that she incurred some other injury as a consumer.  Likewise, Plaintiff's battery claim in Count VI does not depend on the recognition of life as an injury but instead contends that the act of transferring the Stranger Couple's embryo (instead of Plaintiff's embryo) into Plaintiff was itself an independent wrong, constituting an unauthorized and harmful contact with Plaintiff's body.[2]  (See doc. 1, pp. 36–37.)

The Court is thus not persuaded that Plaintiff's claims constitute a covert wrongful birth action.  Therefore, the Court denies Defendants' arguments for dismissal on that ground.

## II.  Whether Plaintiff has Sufficiently Alleged Proximate Causation for Loss of Custody

Defendants contend that they are not liable for damages resulting from Plaintiff's loss of custody, claiming that "[t]he custody question is even more straightforward than the wrongful birth issue."  (Doc. 36, p. 11.)  "In short, Defendants posit that there can be no damages against them arising from Plaintiff's loss of custody because that (undeniably difficult) decision was made by Plaintiff herself."  (Id.)  They claim there is thus a lack of proximate cause, precluding Plaintiff from recovering.  (Id.)

"To recover damages in a tort action, a plaintiff must prove that the defendant's negligence was both the 'cause in fact' and the 'proximate cause' of the injury."  Reed v. Carolina Cas. Ins. Co., 762 S.E.2d 90, 93 (Ga. Ct. App. 2014) (quoting Atlanta Obstetrics & Gynecology Grp., P.A. v. Coleman, 398 S.E.2d 16, 17 (Ga. 1990)).  The proximate cause requirement "constitutes a limit on legal liability; it is a policy decision that, for a variety of reasons[,] . . . the defendant's conduct and the plaintiff's injury are too remote for the law to countenance recovery."  Id. (quoting Delta Airlines, Inc. v. Townsend, 614 S.E.2d 745, 749 (Ga. 2005)).  A defendant's negligence is the

---

[2]  Defendants themselves note that Count VI does not appear to be subject to dismissal based solely on the wrongful birth doctrine.  (Doc. 36, p. 12.)

proximate cause of a plaintiff's injury when the defendant "should have anticipated that [the] general type of harm might result" from their negligent conduct.  Smith v. Com. Transp., Inc., 470 S.E.2d 446, 448 (Ga. Ct. App. 1996) (citing Gen. Motors Corp. v. Davis, 233 S.E.2d 825, 827 (Ga. Ct. App. 1977)).  Typically, proximate cause is a question of fact for the jury.  Ontario Sewing Mach. Co. v. Smith, 572 S.E.2d 533, 535 (Ga. 2002).  Questions regarding proximate cause may only be determined by courts "in plain and undisputed cases."  Id. at 536 (internal quotations omitted).

Defendants argue that an "intervening sequence" of decisions by other parties "eliminates proximate cause as a matter of law."  (Doc. 48, p. 6.)  The "doctrine of intervening causes" is a method for defeating proximate cause.  See City of Richmond Hill v. Maia, 800 S.E.2d 573, 576 (Ga. 2017).  Under this doctrine, "there can be no proximate cause where . . . an independent act or omission of someone other than the defendant, which was not foreseeable by defendant, was not triggered by defendant's act, and which was sufficient of itself to cause the injury" occurred.  Id. at 576–77 (quoting McQuaig v. McLaughlin, 440 S.E.2d 499, 502–03 (Ga. Ct. App. 1994)).  An intervening act does not defeat proximate cause "if the nature of such intervening act was such that it could reasonably have been anticipated or foreseen by the original wrongdoer."  Reed, 762 S.E.2d at 93 (internal quotation omitted); see also Ontario Sewing, 572 S.E.2d at 536 (proximate cause not defeated where intervening cause's "probable or natural consequences could reasonably have been anticipated, apprehended, or foreseen by the original wrong-doer" (quoting Williams v. Grier, 26 S.E.2d 698, 704 (Ga. 1943))).  As with proximate cause generally, "[w]hether an intervening act was reasonably foreseeable is a question for the jury to decide except in 'plain and indisputable cases.'"  N. Ga. Elec. Membership. Corp. v. Webb, 540 S.E.2d 271, 274 (Ga. Ct. App. 2000) (quoting Schernekau v. McNabb, 470 S.E.2d 296, 298 (Ga. Ct. App. 1996)).  Here,

12

Defendants state that Plaintiff's "voluntary decision" to relinquish custody of her child, while made on the advice of independent counsel, "was the immediate cause of her loss." (Doc. 48, p. 6.)  Defendants argue that Plaintiff's decision constitutes an intervening sequence severing the causal chain and they emphasize that this "intervening sequence" of events involved "a South Carolina state court decision over which Defendants had no input." (Id.)

While it appears undisputed that numerous intervening acts occurred between the Defendants' transfer of the incorrect embryo and Plaintiff's relinquishment of custody, such acts will not defeat proximate cause if they were arguably foreseeable.  Plaintiff emphasizes that proximate cause is a jury question and argues that "[i]t is reasonable to assume the biological parents would demand custody of their biological child." (Doc. 40, pp. 7–8.)  Plaintiff further disputes Defendants' characterization of her decision to relinquish custody of the child as "voluntary," claiming that she "felt compelled to do so only after her family-law counsel explained that she would shortly lose custody through court order." (Id. at p. 8.)

The Court agrees with Plaintiff that the issue of proximate cause should be left to the jury here.  While Defendants may contest the foreseeability of the complex sequence of events that occurred after the incorrect embryo transfer, that does not render this a "plain and undisputed" case warranting judicial usurpation of the jury's role.  A reasonable jury could conclude that Defendants should have anticipated that implanting another couple's embryo into a patient may result in that patient losing custody of the child.  That is a factual question that should not be decided at this stage.  As such, the Court is not persuaded that Plaintiff's claims for injuries following her loss of custody fail as a matter of law.

**III.    Whether Plaintiff has Sufficiently Alleged a Battery Claim (Count VI)**

While Defendants appear to concede that Plaintiff's battery claim (Count VI) is not subject to dismissal based on the wrongful birth doctrine discussed above, they argue that the claim nevertheless fails as a matter of law. (Doc. 36, pp. 12–13.) It is undisputed that Plaintiff consented to the IVF procedure at issue and, as Defendants note, there is no allegation that Plaintiff's consent was not freely given or was procured by fraud. Defendants thus aver that Count VI must be dismissed as "Plaintiff's consent . . . abrogates this claim." (Id. at p. 12.)

Defendants analogize the present action to Bowers v. Lee, 577 S.E.2d 9 (Ga. Ct. App. 2003). In Bowers, the Georgia Court of Appeals rejected a battery claim brought by a patient who had a surgical sponge left inside her body following an operation. 577 S.E.2d at 10. As is the case here, the Bowers plaintiff consented to the procedure and no allegations were made that her consent was in any way deficient. Id. The court construed the plaintiff's battery claim as one predicated on the fact that she "did not consent to the negligent performance of the procedure to which she gave her general consent." Id. In rejecting this theory of battery, the court held that "such a claim is encompassed in an action for medical malpractice, not in an action for battery," and allowing it to proceed as such "would transform every medical malpractice claim into a battery claim." Id. The court further noted that "battery is an intentional tort" and there was no evidence that the sponge was intentionally left in the plaintiff's body. Id. Defendants argue that there is similarly no allegation here that the wrong embryo was intentionally implanted in Plaintiff's body, further warranting dismissal. (Doc. 36, p. 13.)

Generally, a plaintiff who consents to medical treatment may not later bring a battery action against the treating physician. See Mims v. Boland, 138 S.E.2d 902, 906 (Ga. Ct. App. 1964) ("In the relationship of doctor and patient, as in other situations involving a touching of another's person, consent to the act by the person affected negates the contact as an actionable tort.").

14

However, the consenting patient may still recover for medical battery by establishing "that the treatment was at substantial variance with the consent granted." Morton v. Wellstar Health Sys., Inc., 653 S.E.2d 756, 757 (Ga. Ct. App. 2007) (citing Sood v. Smeigh, 578 S.E.2d 158, (Ga. Ct. App. 2003)). Under this principle, improperly performing a consented-to procedure can lead to liability for medical battery. See, e.g., Sood, 578 S.E.2d at 162 (holding that "the installation of the prosthetic patella in a backward position contrary to the instruction and design of the device would constitute an unconsented-to battery . . . because such action was contrary to any informed consent granted"); Lockhart v. Bd. Of Regents of Univ. Sys. of Ga., 730 S.E.2d 475, 478 (Ga. Ct. App. 2012) ("Our courts have found that unauthorized medical touching, similar to what happened to [plaintiff] when [defendant] worked on her lower teeth rather than her upper teeth [as consented to], is a battery sounding in tort.").

Here, Plaintiff alleges that she only consented to the transfer of an embryo from her own genetic material and that the transfer of the Stranger Couple's embryo "was therefore unauthorized and unprivileged as it exceeded Plaintiff's scope of consent." (Doc. 1, p. 36.) Despite Defendants' argument that Plaintiff "has not alleged that Defendants performed an unauthorized procedure or that the procedure exceeded the scope of consent," (doc. 36, p. 13), the Complaint plainly alleges that Defendants exceeded the scope of what Plaintiff consented to, (doc. 1, p. 36). Whether Defendants actually did so is a question of fact for a jury to determine. See Perry v. Hodgson, 148 S.E. 659, 663 (Ga. 1929) ("Whether plaintiff consented to the operation which was performed . . . [is a] question[] for the jury to determine."); Gillis v. Cardio TVP Surgical Assocs., P.C., 520 S.E.2d 767, 772 (Ga. Ct. App. 1999) (citing Bailey v. Belinfante, 218 S.E.2d 289, 291–92 (Ga. Ct. App. 1975)) (scope of consent is jury issue). Plaintiff has thus pled a cognizable battery claim.

As to the argument that Count VI fails due to the supposed lack of intent, (doc. 36, p. 13), Defendants confuse the required legal standard.  While battery is an intentional tort, Plaintiff correctly notes that the intent required is not necessarily to cause harm.  (Doc. 40, pp. 9–10 (citing Lockhart, 730 S.E.2d at 478 (rejecting theory that medical battery "should only apply in cases where the perpetrator acted with the intent to cause harm")).)  Rather, liability for battery may be premised upon the "mere intent to make contact of an insulting or provoking nature."  Hendricks v. S. Bell Tel. & Tel. Co., 387 S.E.2d 593, 595 (Ga. Ct. App. 1989).  In other words, all that Plaintiff must allege is that Coastal Fertility intentionally made contact with Plaintiff and that this contact was harmful or offensive.  See id.  Plaintiff has indeed done so.  (See doc. 1, pp. 36–37.)  The holding in Bowers, a summary judgment case decided upon evidentiary grounds, does not change the analysis.  See 577 S.E.2d at 10–11.  Defendants' arguments for dismissing Count VI are thus unavailing.

## IV.    Whether Plaintiff's SCUTPA Claim (Count VIII) Fails as a Matter of Law

In Count VIII Plaintiff asserts that statements on Coastal Fertility's website regarding the clinic's high standards for safety and care violate the SCUTPA.  (Doc. 1, pp. 42–46.)   In arguing for the dismissal of Count VIII, Defendants urge that Georgia law governs this action.  (Doc. 36, p. 11.)  Georgia law follows the traditional choice of law principles of *lex loci delicti* in tort cases, applying the substantive law of the state where the tort was committed as determined by where the injury was sustained, or (put another way) "where the last event necessary for liability occurs."  Garland v. Advanced Med. Fund, L.P. II, 86 F. Supp. 2d 1195, 1205 (N.D. Ga. 2000).  Federal courts applying Georgia's choice of law rules to the torts of fraud and misrepresentation have "determined that the place of the injury is where the economic loss occurred rather than the state where the fraudulent misrepresentations were made," with the plaintiff's state of residence

16

constituting the *situs* of the economic injury.  See id. (holding that claims for fraud and negligent misrepresentation were governed by the law of plaintiff's state of residence under *lex loci delicti*); Velten v. Regis B. Lippert, Intercat, Inc., 985 F.2d 1515, 1521 (11th Cir. 1993) (holding that Georgia, where plaintiff resided, was the *lex loci delicti* because "any harm suffered as a result of the fraud occurred there" and because the last events necessary for fraud liability (reliance and damages) would have both occurred in Georgia).  Defendants argue that, because "Georgia law controls and the SCUTPA has no extraterritorial application" to injuries sustained in other states, Count VIII necessarily fails.  (Doc. 36, p. 11.)

The Court agrees with Defendants.  Plaintiff is, and at all relevant times was, a Georgia resident.  (Doc. 1-1 p. 10.)  The Complaint states that Plaintiff contracted with Coastal Fertility for fertility services in Georgia and received "the vast majority" of her medical treatment at Coastal Fertility's Savannah facility.  (Id. at p. 12.)  Moreover, Plaintiff herself concedes that she "felt her injuries in Georgia" and "agree[s] that Georgia law applies to the tort claims here."  (Doc. 40, pp. 2, 11.)  The Court thus finds that Georgia law controls and that Plaintiff cannot maintain her claim under SCUTPA.  See Callen v. Daimler AG, No. 1:19-CV-1411-TWT, 2020 WL 10090879, at *20 (N.D. Ga. June 17, 2020) (dismissing SCUTPA claim under Georgia's choice of law rule where plaintiff was defrauded in North Carolina and, consequentially, North Carolina law controlled).

The Court thus **GRANTS** Defendants' Motion for Judgment on the Pleadings with respect to Count VIII.  (Doc. 36.)  Of course, Plaintiff has asserted an identical claim for relief under Georgia's FBPA in Count VII.  (Doc. 1, pp. 37–42.)  This claim remains viable and Plaintiff may therefore still recover for Defendants' allegedly deceptive statements should she meet her burden of proof under Georgia's FBPA.

17

## CONCLUSION

For the reasons set forth above, the Court **GRANTS in part and DENIES in part** Defendants' Motion for Judgment on the Pleadings.  (Doc. 36.)  Specifically, the Court **GRANTS** the Motion with respect to Count VIII and therefore **DISMISSES** Count VIII.  The Court **DENIES** Defendants' Motion with respect to all other claims.  (Id.)

**SO ORDERED**, this 25th day of February, 2026.

_____
R. STAN BAKER, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

18